UNITED STATES of America, Plaintiff,

v.

Sotirios FLOULIS a/k/a Sam
Louis, Defendant.

Crim. A. No. 77–297.

United States District Court,
W. D. Pennsylvania.

Oct. 12, 1978.

Robert J. Cindrich, U. S. Atty., and Judith K. Giltenboth, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

James J. Orlow, Philadelphia, Pa., Thomas J. Shorall, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, Chief Judge.

A one count indictment charges the Defendant Sotirios Floulis under 8 U.S.C. § 1326 with re-entering the United States after he was deported without first obtaining the requisite permission of the Attorney General. At the non-jury trial on May 14, 1978, the Defendant testified and admitted all of the critical facts alleged in the indictment. Particularly, the Government established and the Defendant either admitted or failed to controvert the following facts. The Defendant, a Greek citizen, entered the United States illegally in 1970 as a crewman aboard the M/V Metten. On April 18,

1974, the Defendant was apprehended in Cleveland and was served with a warrant for his arrest, an order to show cause why he should not be deported, and a notice of a scheduled deportation hearing. On May 6, 1974, the Defendant married Judy Wancho before a Justice of the Peace in Painesville, Ohio. On May 8, 1974, an immigrant visa petition was filed on the Defendant's behalf. A deportation hearing was held in Cleveland on May 22, 1974 before an Immigration Judge who granted the Defendant the privilege of voluntary departure to either England or Greece by June 22, 1974. Pursuant to a letter from Attorney Kenneth Boukis who represented the Defendant at the deposition hearing, the voluntary departure date was extended to September 20, 1974. On October 24, 1974, the immigrant visa petition which was filed on May 8, 1974 was granted. After the Defendant's additional requests for extensions of the voluntary departure date were denied and after the Defendant's marriage to Judy Wancho was annulled, the Defendant was taken into custody on March 13, 1975, held pending deportation, and served with a deportation warrant. On March 14, 1975, the Defendant was advised that his applications for extensions of the voluntary departure date had been denied. Finally, on March 21, 1975, the Defendant was deported to Athens, Greece from New York City.

Before his departure, the Defendant was warned of the possible penalties awaiting deported aliens who re-enter the United States without first receiving the permission of the Attorney General to re-apply for admission. Despite this notice, the Defendant re-entered the United States on March 29, 1976, at Norfolk, Virginia after arriving aboard the M/V Livanos. On September 29, 1977, the Defendant visited the Pittsburgh office of the Immigration and Naturalization Service (hereinafter, "INS"). During an interview on that date with an INS officer, the Defendant admitted the facts critical to the charge under 8 U.S.C. § 1326, namely, that the Defendant entered the United States in 1976 after he was deported without first obtaining the permission of the Attorney General to re-apply for re-entry.

On November 8, 1977, the INS certified the nonexistence of any record indicating that the Defendant had applied for permission to re-apply for re-entry before re-entering the United States in 1976. The Defendant was indicated in November 1977, and he applied on Feb. 8, 1978 for permission to re-apply for re-entry into the United States. This application was returned for additional information, and on March 6, 1978 the Defendant's attorney re-submitted this application which is still pending.

The Defendant's whole defense to this charge is technical rather than substantive. The Defendant contends that his deportation in 1975 was unlawful and thus cannot provide the basis for a conviction under 8 U.S.C. § 1326, which prohibits deported aliens from re-entering the United States without the requisite permission of the Attorney General. Specifically, the Defendant argues that the failure of the INS to comply with its own regulations concerning the conduct of the deportation hearing and those concerning the denial of the Defendant's applications for voluntary departure results in a denial of due process as guaranteed by the 14th Amendment. The Defendant presumes that each and every failure to comply with INS regulations is tantamount to a denial of due process. For reasons set forth herein the Court notes that the Defendant here is not constitutionally entitled to a perfect deportation proceeding and that errors in the deportation proceeding do not necessarily constitute a denial of due process, see, e. g., *Burquez v. Immigration Serv.*, 513 F.2d 751 (10th Cir. 1975); *Jolley v. Immigration Serv.*, 441 F.2d 1245 (5th Cir.) *cert. denied* 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971).

This case presents two specific issues: 1) whether the Defendant may raise the validity of his prior deportation hearing as a defense to the indictment under 8 U.S.C. § 1326; and 2) whether the alleged violations of the administrative regulations resulted in a fundamentally unfair proceeding and in a consequent denial of due process.

Concerning the first issue, *United States v. Bowles*, 331 F.2d 742 (3d Cir. 1964)

sets out the controlling Third Circuit rule that the defendant in a prosecution under 8 U.S.C. § 1326 may collaterally attack the validity of a prior deportation hearing to show that he was not deported "according to law," 331 F.2d at 749. The mandate of *Bowles* that a defendant be deported "according to law" requires that the defendant receive during his deportation procedures some [1] of those procedural and substantive protections generally encompassed by the due process clause of the 14th Amendment as applied to deportation hearing procedures, see *The Japanese Immigrant Case*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903). In deciding what specific protective rights the due process clause provides to aliens, courts have historically examined the deportation proceeding under scrutiny from the standpoint of fundamental fairness, see, e. g., *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). Conversely to safeguard against fundamental unfairness in deportation hearings, the courts have formulated an analytical approach which would allow the prior deportation proceedings to stand as valid unless convinced by the defendant that there was a "gross miscarriage of justice in the former proceedings." *United States ex rel Steffner v. Carmichael*, 183 F.2d 19, 20 (5th Cir. 1950) [quoted with approval, *McLeod v. Peterson*, 283 F.2d 180, 184 (3d Cir. 1960)].

 In holding invalid a deportation order resulting from a hearing which proceeded despite the absence of the alien's retained counsel, the Court in *Chlomos v. Immigration and Naturalization Service*, 516 F.2d 310 (3d Cir. 1975) enumerated the following requisites for due process in deportation proceedings 1) reasonable notice of the charges; 2) the privilege of counsel; 3) the opportunity to present evidence and cross-examine witnesses; and 4) a decision of deportability based upon reasonable, substantial and probative evidence. 516 F.2d at 313. See also, *Cheng Fan Kwok v. Immigration Service*, 392 U.S. 206, 209, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968). The Defendant in the instant case makes no claim that his proceeding lacked any of the above requisites. Instead, the Defendant argues that the failure of the INS to comply with several regulations amounts to a denial of due process. Although we will later examine each of the claimed violations, we do not believe that the failure of the INS to comply with its regulations constitutes a *per se* denial of due process rendering the Defendant's deportation proceedings constitutionally defective and requiring the dismissal of the indictment. The contours of the due process clause are too deeply rooted in lasting constitutional principles to depend upon administrative regulations for the specific protections the clause affords. What is "fundamentally fair" for a defendant in a prosecution under 8 U.S.C. § 1326 cannot vary each time the Attorney General amends the immigration regulations.

 Accordingly, the inquiry in this case is not, as the Defendant suggests, simply whether the Government complied in all respects with its regulations but rather whether the whole proceeding was "fundamentally fair" or involved the "gross miscarriage of justice" mentioned in *Steffner* and *McLeod*. To adopt the Defendant's view is to hold that every amendment to the administrative regulations on immigration—no matter how inconsequential— changes the protections of the 14th Amendment in deportation hearings. Due process cannot be so amorphous that its boundaries may change with each new issue of the

---

1. Deportation proceedings are civil, not criminal, in nature, *Nai Cheng Chen v. Immigration and Naturalization Service*, 537 F.2d 566 (1st Cir. 1976); *United States v. Gasca-Kraft*, 522 F.2d 149 (9th Cir. 1975). As a result of their civil nature, aliens are not necessarily entitled to the same due process protections which defendants in criminal prosecutions customarily receive, *see, e. g., Avila-Gallegos v. Immigration and Naturalization Service*, 525 F.2d 666 (2d Cir. 1975) (*Miranda* warnings not required); *Jolley v. Immigration and Naturalization Service*, 441 F.2d 1245 (5th Cir. 1971), *cert. denied* 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971) (same). That the alien at a deportation hearing is not entitled to the same due process protections from which criminal defendants benefit is consonant with the recognized flexibility of due process according to the particular proceeding under review, *see, e. g., Main Road v. Aytch*, 565 F.2d 54, 58 (3d Cir. 1977).

*Federal Register.* We see, then, that the Defendant is not entitled to the dismissal of his indictment solely because an administrative regulation was violated. What is required is some fundamental unfairness which may or may not happen to violate an immigration regulation. These principles having been enunciated, we will now examine each of the Defendant's contentions about his deportation hearing and his applications for extension of the voluntary departure date.

The Defendant contends that the indictment should be dismissed because the INS failed to comply with its regulations during the Defendant's 1975 deportation proceedings.

 First, the Defendant contends that the Government has not proven in the instant case that the INS notified the Defendant that he may contact his consul, as provided by 8 C.F.R. § 242.2(e). INS official John Sigler testified that the Cleveland INS office orally notifies each alien that he may contact his consul but that the office does not specifically record in writing in each alien's file that the alien was so notified. Mr. Sigler could not specifically recall advising the Defendant that he could contact his consul. Nevertheless, the Court is satisfied by Mr. Sigler's explanation of his office procedures that the INS did, in fact, notify the Defendant that he could contact his consul.[2] The absence of such notice, however, would not require the dismissal of the Defendant's indictment because such notice would hardly be critical to the fundamental fairness of a hearing for a defendant who was represented by counsel at the deportation hearing.

 Second, the Defendant argues that the deportation proceeding was "irregular on its face" and thus requires the dismissal of the indictment because the INS did not attempt to comply at the hearing with procedures set out in 8 C.F.R. § 242.16(a). This regulation requires the inquiry officer (in this case, the Immigration Judge) to advise the alien of his right to representation at the hearing at his own expense, of his right to present evidence and cross-examine adverse witnesses, and of his right to a simple explanation of the charges which the Government brings against him. The Defendant and his brother appeared together before the Immigration Judge for a joint deportation hearing. Our examination of the record of the hearing indicates that the Defendant was present when the Immigration Judge told his brother, who was not represented by counsel, that he had a right to be represented by counsel at no expense to the Government, and that he could object to the admission of any papers or documents. (Government Exhibit 6, Hearing Transcript, p. 2). Furthermore, the Immigration Judge explained to the Defendant's brother that he may be subject to deportation because the Government charged that he remained in the United States for a period of time exceeding that which alien crewmen are allowed to remain in the United States. The Defendant had the opportunity to hear these disclosures which satisfy 8 C.F.R. § 242.16(a). Even if the disclosures were not as adequate as they were, the Defendant had the benefit of an attorney familiar with deportation law with whom he presumably conferred before he came to the hearing where he did not contest the Government's charges.

 Third, the Defendant contends that the Immigration Judge based her finding of deportability on statements of Attorney Kenneth Boukis who represented the Defendant at the deportation hearing without first obtaining from Defendant his confirmation that Mr. Boukis was authorized to speak for him. The Defendant's present counsel, Attorney Orlow, suspects that the Defendant acknowledged Attorney Boukis's authorization in an off the record conference, but Attorney Orlow argues that such an authorization contravenes both the letter and the spirit of 8 C.F.R. § 242.16(b) which states that the hearing officer shall require the respondent to either admit or deny the factual allegations of deportability presented by the Government. For at least four

**2.** Under F.R.Evid. 406, the routine practice of a government agency is admissible to prove that the practice was in fact followed in a particular case.

reasons, we cannot accept Mr. Orlow's reasoning: 1) 8 C.F.R. § 242.16(b) does not require that a respondent's authorization for his attorney to speak on his behalf be placed on a record; 2) 8 C.F.R. § 242.15 allows the inquiry officer to exclude from the record, in his discretion, any arguments about motions, applications, requests or the like; this allowance reflects the intention of the Attorney General that the record of a deportation hearing must not necessarily include all that occurred at the hearing; 3) the Defendant does not now contend that Mr. Boukis was in fact not authorized to speak on his behalf at the deportation hearing; and 4) the Defendant, who both understands and speaks English, did not object at the deportation hearing that Attorney Boukis had no authority to speak for him.

In sum, the evidence adduced at trial indicates that the officials of the INS in fact substantially followed the applicable regulations during the conduct of the Defendant's deportation hearing and that the Defendant's hearing was fundamentally fair.

The Defendant also argues that the INS did not follow its own regulations in regard to the Defendant's applications for extensions of his voluntary departure date. To achieve certain economies, an immigration official may in his discretion authorize the alien to depart voluntarily at his own expense before a specified date instead of being deported, i. e., taken into custody and accompanied by an INS official to the point of departure, 8 U.S.C. § 1252(g) (1977 Supp.); 8 C.F.R. § 244.1. Upon application by the alien, the voluntary departure date may be extended, 8 C.F.R. § 244.2. If the alien does not leave by the specified date, he may be apprehended and deported. If an alien departs voluntarily before the specified date, he may return to the United States without securing the permission of the Attorney General to re-apply for re-entry; if the alien is deported, his re-entry to the United States without first obtaining the required permission of the Attorney

General may result in his conviction under 8 U.S.C. § 1326.

At his hearing, the Immigration Judge granted the Defendant the privilege of voluntary departure until June 22, 1974 (Government Ex. 6, at 15). The INS later extended the Defendant's voluntary departure date to September 20, 1974 on the grounds that the Defendant and his wife were awaiting the disposition of his wife's petition to reclassify the Defendant for an immigration visa (Government Exhibit 6, Boukis letter to Sigler, June 17, 1974).

These same grounds were repeated in the same language in the Defendant's request on August 28, 1974 to re-extend the Defendant's voluntary departure date (Government's Exhibit 6, Boukis's letter to Sigler, August 28, 1974).[3] After his marriage was annulled and his wife's petition to re-classify the Defendant for an immigration visa was withdrawn, the INS denied the defendant's pending application for extension of the voluntary departure date, apprehended the Defendant on March 13, 1975, and deported him on March 21, 1975.

■ The Defendant argues that he was not deported "according to law" because the INS did not follow its own regulations regarding the Defendant's application for extension of the date of voluntary departure. At the outset, we question whether it is permissible under *Bowles* for the Defendant to attack collaterally the validity of his prior deportation on the basis of procedural events which occurred after his deportation hearing. In *Bowles*, the defendant argued that his original deportation was based upon a record of a state court larceny conviction which was apparently in error because on the date which the record indicated he was convicted, Mr. Bowles was in the service of the army. In allowing Bowles to attack collaterally the consequent deportation order, the Court of Appeals permitted him to re-open only the merits of the deportation. The Court was not faced, as we are here, with allegations that the pro-

---

3. Government Exhibit 6 contains copies of documents concerning the Defendant's deportation proceedings.

cedures undertaken after the hearing but prior to deportation violated due process. We doubt the *Bowles* court would have gone so far. Accordingly, we hold that the Defendant may collaterally attack his deportation as a defense to a prosecution under 8 U.S.C. § 1326 only on grounds which go to the merits of the alien's deportability and on some procedural grounds which are related to the conduct of a full and fair hearing on the merits (i. e. the right to examine all evidence) but may not collaterally attack his deportation on procedural grounds which relate to events occurring after the deportation hearing (i. e. applications for extension of voluntary departure) and which have no bearing on the conduct of a fundamentally fair hearing on the merits of whether the alien is deportable. In *Bowles*, the Court expressly recognized that the right of an alien to attack collaterally his prior deportation proceedings was subject to limitation, 331 F.2d at p. 750.

█ Assuming that the Defendant may collaterally attack his prior deportation proceedings on the basis of events which occurred after the hearing on the deportability issue, our review of the proceedings reveals no fundamental unfairness to the Defendant which warrants dismissal of the indictment.

█ First, the Defendant asserts that the decision to deny his additional application for voluntary surrender contravenes due process because the decision, *inter alia*, was a secret decision on an unreliable basis. The Defendant overlooks the fact that the voluntary departure is a privilege, not a right. The decision to deny or to grant voluntary departure is within the broad discretion of the Attorney General or his delegate, see *Strantzalis v. Immigration Serv.*, 465 F.2d 1016, 1017–18 (3d Cir. 1972). Although financial resources and good moral character are generally held to be requi-

sites for voluntary departure, the Attorney General's broad discretion allows him to refuse voluntary departure on other grounds so long as his decision is not arbitrary, capricious, or an abuse of discretion, *United States ex rel Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1956). Courts have affirmed the refusal of the INS to grant voluntary departure if the alien tried to avoid detection, *Strantzalis*, supra at 1017, or if evidence suggests that the alien married an American citizen solely to evade the immigration law of the United States, *Sideropoulos v. Immigration Serv.*, 357 F.2d 642 (6th Cir. 1966). This latter ground may be particularly applicable here, for the evidence adduced at trial indicated that the Defendant married Judy Wancho before a Justice of the Peace on May 6, 1974 after the Government issued on April 18, 1974 an order to show cause why the Defendant should not be deported. In both his applications for extension of the date of voluntary departure, the Defendant cited his marriage to an American citizen and her pending application for an immigration visa for him as the principal reasons for wanting to remain in the United States after his scheduled voluntary departure dates. The INS cited the annulment of the Defendant's marriage as the reason for denying his application for extension of the voluntary departure date. Because we find this decision neither arbitrary nor capricious, we must allow it to stand.[4]

█ Likewise, we find no merit in the Defendant's related argument that the denial of voluntary departure violated 8 C.F.R. § 103.2(b)(2) because the Defendant did not have the opportunity to controvert the basis of the decision of the INS to deny him another extension of his voluntary departure date. The Defendant did not claim then nor does he claim now that there was

---

4. We note that in *Hintopoulos*, supra, the Supreme Court affirmed the decision of the hearing officer on facts which appear to be more favorable to the alien than those here. There, the hearing officer denied suspension of deportation on the grounds that the aliens, a husband and wife who entered the United States as seamen, "had established no roots or ties in

this country." After the aliens entered the country, a child was born to them and it was admitted that the child would suffer economically if his parents were deported. Nevertheless, the Supreme Court held that the decision denying suspension of deportation involved no abuse of discretion and was neither arbitrary nor capricious, 353 U.S. at 77, 77 S.Ct. at 621.

any factual dispute about the status of his marriage to Judy Wancho and, absent such allegations, we cannot say that the failure of the government to provide such an opportunity to rebut constituted fundamental unfairness.

Second, the Defendant contends that the INS improperly based its denial of the Defendant's application for extension of the voluntary departure date on the annulment of his marriage, instead of on some reasoned exercise of discretion. The Defendant bases his argument on the March 14, 1975 letter from Officer Sigler to Attorney Boukis which states: "since the dissolution of the marital relationship, your client no longer derives any benefits under the immigration laws and your request must be, and is hereby denied," (Government Exhibit 6). The Government correctly points out, however, that Officer Sigler may have used this language because the Defendant's marriage was the entire basis for the Defendant's application for extension of the departure date. The annulment of the marriage eliminated the basis for the Defendant's application for extension of the voluntary departure date. Just as the INS had acted within its discretion in granting one application for extension of the departure date on the basis of the Defendant's marriage, it could properly deny further applications for extension of the voluntary departure date on the basis that the marriage had been annulled. In any event, there is no indication that the INS's decision was arbitrary, capricious, or based on an abuse of discretion. Accordingly, the decision must stand.

Third, the Defendant asserts that he was not given 72 hours advance notice of the time and place at which he was to surrender completely ready for deportation, as required by 8 C.F.R. § 243.3. The Defendant was arrested on March 13, 1975 and the Defendant was not served with his deportation warrant until March 14, 1975. This delay of notice does not necessarily amount to a denial of due process. First, while the Defendant did not receive the deportation warrant until the day after he was apprehended, the Defendant was notified on August 13, 1974 that his failure to depart by September 20, 1974 would leave him subject to deportation (Government Exhibit 6, letter from Deportation Officer Kowalchik to Defendant, August 13, 1974). Furthermore, he knew that the continuation of his marriage was the basis for his request for extension of the voluntary departure date, and that the annulment of his marriage would also annul the basis for this request and might result in the withdrawal of his wife's petition for an immigration visa which in fact occurred. Second, the Defendant had almost a year from the date of his deportation hearing to arrange his personal and business affairs in anticipation of his possible deportation. While the better practice would have been to serve the deportation warrant before taking the Defendant into custody, we do not see that any fundamental unfairness resulted to the Defendant which would warrant the dismissal of the indictment. In addition to the notice the Defendant had of the imminence of his deportation if his marriage was annulled, the courts have said an alien has no constitutional right against warrantless arrest of a magnitude sufficient to require the dismissal of proceedings against him or to void any consequent deportation order, see *Medina-Sandoval v. Immigration Serv.*, 524 F.2d 658 (9th Cir. 1975); *La Franca v. Immigration Serv.*, 413 F.2d 686 (2d Cir. 1969); *Avila-Gallegos v. Immigration Serv.*, 525 F.2d 666 (2d Cir. 1975); *Tsimounis v. Holland*, 132 F.Supp. 754 (E.D.Pa.1955), aff'd 228 F.2d 907 (3d Cir. 1956). This line of decisions parallels those decisions which hold that an alien facing deportation is without the panoply of constitutional rights which criminal defendants enjoy, see, e. g., *Henriques v. Immigration Serv.*, 465 F.2d 119 (2d Cir. 1972) (allegedly indigent alien not entitled to counsel at government expense when sole issue is whether he overstayed his four day visa); *Ah Chiu Pang v. Immigration Serv.*, 368 F.2d 637 (3d Cir. 1966), cert. denied 386 U.S. 1037, 87 S.Ct. 1490, 18 L.Ed.2d 601 (1967) (aliens in deportation proceedings not entitled to counsel at government expense and notification of constitutional rights); *Jolley v. Immigration Serv.*, supra at 1255 (alien's statements to immigration officer not inad-

missible at deportation hearing because officer did not give *Miranda* warnings to alien).