**UNITED STATES of America,**
**Appellee,**

v.

**Mark Anthony JOHNSON, a/k/a "Maxie Johnson," a/k/a "Brown Marvin," Defendant–Appellant.**

**Docket No. 03–1671.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 23, 2004.

Decided: Dec. 2, 2004.

Steven M. Statsinger, Legal Aid Society, Federal Defender Division Appeals Bureau, New York, N.Y., for Defendant–Appellant.

Katherine A. Lemire, Assistant United States Attorney for the Southern District of New York, New York, N.Y. (Jonathan S. Kolodner, Assistant United States Attorney, and David N. Kelley, United States Attorney, on the brief), for Appellee.

Before: NEWMAN, MINER, and KATZMANN, Circuit Judges.

MINER, Circuit Judge.

Defendant–Appellant, Mark Anthony Johnson ("Johnson"), appeals from a judgment of conviction and sentence on a one-count indictment charging him with reentering the United States after deportation for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2). The judgment was entered after a non-jury trial on stipulated facts in the United States District Court for the Southern District of New York (Jones, J.). Prior to trial, Johnson had moved to dismiss the indictment, claiming that the order of deportation was unlawful by reason of the erroneous advice of an Immigration Judge. The District Court rejected the claim and found that Johnson had failed to fulfill the statutory requirements for a collateral challenge to the deportation order.

## BACKGROUND

Johnson is a thirty-four-year-old native and citizen of Jamaica who entered the United States as a lawful permanent resident on January 23, 1987. Prior to his deportation in August 2000, Johnson had been convicted of two felonies: On February 11, 1993, he was convicted in New York State Supreme Court, Kings County, for attempted sale of a controlled substance in the third degree. This conviction arose from the sale of crack cocaine to a New York City Police Department undercover officer. For this offense, Johnson was sentenced to a one-month term of imprisonment and to a five-year term of

probation. Then, while on probation, he was convicted in New York State Supreme Court, Nassau County, of aggravated unlicensed operation of a motor vehicle in the first degree. This conviction apparently was predicated upon the operation of an automobile following license suspension for failure to pay traffic tickets. For that offense, Johnson was sentenced to a probation term of five years.

Upon his arrival in the United States on January 30, 2000, after a trip to Jamaica, Johnson was apprehended at the airport by agents of the Immigration and Naturalization Service ("INS").[1] In a Notice to Appear ("NTA") issued by the INS on the same date, he was charged with being removable as an alien convicted of an aggravated felony after admission, pursuant to § 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"). A superseding NTA was filed on February 7, 2000 classifying Johnson as an "arriving alien" and charging him with being removable as an alien convicted of violating a controlled substance law, pursuant to INA § 212(a)(2)(A)(i)(II). He was also charged with being an alien whom a consular officer or the Attorney General had reason to believe to be an illicit trafficker in a controlled substance, pursuant to INA § 212(a)(2)(C)(i).

Responding to the NTA, Johnson first appeared by counsel before an Immigration Judge ("IJ") assigned to conduct Johnson's deportation hearing. In compliance with the request for briefing by the IJ, counsel for Johnson submitted a memorandum arguing that Johnson was eligible for cancellation of removal as well as for the discretionary relief of waiver of deportation. The government filed a memorandum in opposition, contending that Johnson did not meet the statutory requirements for cancellation of removal and that, by reason of amendments to the INA, discretionary relief from deportation was no longer available.

The amendments referred to came in the form of two statutes enacted by Congress in 1996. The first was the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, 1277–79 (1996) (amending 8 U.S.C. § 1182(c)). Section 440(d) of the AEDPA eliminated the discretionary waivers of deportation for those aliens deportable by reason of having committed an aggravated felony or drug offense. The second statute was the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009–597 (1996). Section 304 of the IIRIRA repealed Section 212(c) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 187 (1952). Section 212(c) of the INA, 8 U.S.C. § 1182(c) (repealed), had provided the Attorney General with broad discretion, which he had delegated to the Board of Immigration Appeals, to waive deportation of aliens who had accrued seven years of lawful residence in the United States. Immigration Judges were constrained to

---

**1.** Pursuant to the Homeland Security Act of 2002, Pub.L. 107–296 § 441, 116 Stat. 2135, 2193 (2002), 6 U.S.C. §§ 202(3) and 251, on March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice, and its functions were transferred to the Department of Homeland Security. United States Immigration and Customs Enforcement ("ICE"), a bureau within the Department of Homeland Security, now bears responsibility for enforcing the immigration laws. *See generally* I.C.E. Press Office, U.S. Dep't of Homeland Security, Fact Sheet, *Immigration and Customs Enforcement (ICE)* (Oct. 6, 2004), *available at* http://www.ice.gov/graphics/news/factsheets/index.htm.

To be consistent with the District Court order, and because the rulings at issue in this case were made when the agency was still the INS, we refer to the relevant agency as the INS in this opinion.

exercise that discretion by balancing the "alien's undesirability as a permanent resident" against the "social and humane considerations presented in his behalf." *Matter of Marin*, 16 I. & N. Dec. 581, 584–85, 1978 WL 36472 (BIA 1978); *see Lovell v. INS*, 52 F.3d 458, 461 (2d Cir.1995).

The 1996 legislation replaced the Section 212(c) provision for discretionary relief from deportation with a more strict procedure designated "cancellation of removal." *See Swaby v. Ashcroft*, 357 F.3d 156, 159 & n. 7 (2d Cir.2004). This procedure, enacted in INA § 240A(a), 8 U.S.C. § 1229b(a), authorizes the Attorney General to cancel removal of certain permanent aliens who are deportable from, or inadmissible to, the United States if three conditions are met. The alien must: (1) have been lawfully admitted as a permanent resident for at least five years; (2) have resided in the United States continuously for seven years after admission in any status; and (3) have not been convicted of any aggravated felony. *Swaby*, 357 F.3d at 159 n. 7.

By an interlocutory decision and order dated May 31, 2000, the IJ denied the relief sought by Johnson. Finding that his state drug-offense conviction fit within the definition of "aggravated felony," *see* INA § 101(a)(43)(B), 8 U.S.C. § 1101(a)(43)(B), the IJ concluded that Johnson was not prima facie eligible for cancellation of removal. The IJ also concluded that Johnson's eligibility was barred by his failure to reside continuously in the United States after he had been admitted in any status, since the continuity had been interrupted by Johnson's 1993 drug conviction and incarceration. As to Johnson's claim for eligibility for a Section 212(c) waiver, the IJ concluded that "this form of relief has been repealed by the enactment of the amendments to the INA wrought by the IIRIRA of 1996, sections 304(b) and 306(d) thereunder." Counsel for Johnson urged that Section 212(c), although repealed, could still be applied to provide discretionary relief from deportation in the case of an aggravated felon whose conviction predated the effective date of the repealing statute. In other words, counsel urged that, because Johnson's conviction in 1993 preceded the 1996 AEDPA legislation repealing § 212(c), the AEDPA could not be applied retroactively to deprive Johnson of eligibility for § 212(c) relief.

The IJ convened a hearing on June 8, 2000, following the issuance of the interlocutory decision and order. Johnson was present at the hearing, and his counsel appeared telephonically. Based on the submissions of counsel, documentary evidence, and the determinations made in the interlocutory decision, the IJ found "that both of the charges set forth in the notice to appear have been sustained by clear and convincing evidence" and that an order of deportation therefore was warranted. Upon inquiry by the IJ regarding designation of a country of removal, counsel responded that Johnson wished to designate Jamaica. The following colloquy ensued:

IJ: Is this going to be a final order today? Are you going to, is Mr. Johnson going to exercise his right to appeal?

Counsel: I'm not sure whether Mr. Johnson's going to exercise his right to appeal or not. Mr. Johnson has expressed some concerns about taking appeal, the time that might take. So—but before I would waive that right on his behalf, I would want to discuss it more formally with him and his family.

IJ: Okay.

Counsel: So at this point I would reserve, unless at this point Mr. Johnson wishes to affirmatively himself state that he wishes to take no appeal.

IJ: Mr. Johnson, you've heard the outcome of this case. Unfortunately for you, I believe the law is against you in this matter. It's a kind of technical or complex analysis and I'll concede that to you. But the bottom line, what's important to you, is I found that under the present Immigration and Nationality Act, the laws and regulations pertaining to that, your conviction precludes you from remaining in the United States under any circumstance.

Now, this is an issue that has not been definitely decided by appellate courts. But it's up to you as to whether you want to take this as a final decision. If you do that, by waiving your right to appeal—because you do have a right to appeal to a higher immigration court—that would necessitate your remaining in detention, obviously, for a period of time.

But be that as it may, that is your right. If you want to waive your appeal, it will be a final order and you will not be able to change your mind later on.

Do you understand? What do you want to do? Your attorney suggested he might want to talk to you about this.

Johnson: No, I do not have the time. I wish to waive my right to an appeal.

IJ: Okay.

Counsel: Judge, I didn't hear what he said.

IJ: He said he wants to waive an appeal.

Counsel: That's what I thought he would say. Okay.

IJ: Do you have any questions, Mr. Johnson?

Johnson: No, sir.

There were no further proceedings in the matter, and Johnson was deported to Jamaica on August 3, 2000. He thereafter returned without authorization and, apparently, came to the attention of the authorities in December of 2002, when he was arrested on an unrelated charge. On January 9, 2003, Johnson was indicted on the one-count charge for which he was convicted in this case, i.e., that

> the defendant, being an alien, unlawfully, willfully, and knowingly did enter, and was found in, the United States, after having been deported from the United States subsequent to a conviction for the commission of an aggravated felony, to wit, a conviction on February 11, 1993 in the New York State Supreme Court, Kings County, for attempted sale of a controlled substance in the third degree, without having obtained the express consent of the Attorney General of the United States to his reapplying for admission.

By motion filed on March 4, 2003, Johnson moved to dismiss the indictment, contending in a supporting memorandum of law "that he was illegally deported after a fundamentally unfair proceeding that deprived him of administrative and judicial review, in violation of the Due Process Clause." Specifically, Johnson alleged that he had been eligible for § 212(c) relief from deportation and that the IJ had incorrectly advised him otherwise. Indeed, the Supreme Court decided, one year following Johnson's hearing before the IJ, that the AEDPA was not retroactively applicable to aggravated felons whose convictions predated the effective date of that statute. *See INS v. St. Cyr*, 533 U.S. 289, 297, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Accordingly, Johnson was in fact eligible for § 212(c) relief at the time of his hearing.

Johnson also contended in his motion in the District Court, as he does here, that he meets the statutory requirements for collateral attack on his deportation order. *See* 8 U.S.C. § 1326(d). Such an attack is permitted by § 1326(d) where: (1) the alien has exhausted available administrative remedies; (2) the proceedings giving rise to the deportation order improperly caused the deprivation of any opportunity for judicial review; and (3) entry of the deportation order was fundamentally unfair. We have held that the third factor requires a showing of "both a fundamental procedural error and prejudice resulting from that error." *United States v. Fernandez–Antonia,* 278 F.3d 150, 159 (2d Cir.2002).

After extensive briefing by both sides following oral argument of the motion to dismiss, the District Court issued an oral decision on June 4, 2003. The District Judge noted that she had listened to the tape recording of the June 8, 2000 deportation hearing [2] and considered all the arguments and submissions of counsel. In determining that Johnson had waived his right to appeal, and therefore had failed to comply with one of the essential statutory requirements for collateral attack on his deportation order, the District Court stated:

> Certainly the [IJ's] finding, accompanied by his explanation that [Johnson] could appeal, was sufficient to explain to [Johnson] that he had a right to appeal. This is not a case ... where it could be argued that the [IJ] misled the defendant, discouraged the defendant from seeking relief or only casually referred to the defendant's right to an appeal.
>
> I find that, contrary to [Johnson's] claims, he was informed of his right to

appeal and given an opportunity to ensure that he understood his right. I find that this defendant waived his right to appeal with the full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. As such, he did not exhaust his remedies with respect to the underlying deportation order, nor was he deprived of the opportunity for judicial review, in my view.

On June 25, 2003, Johnson appeared before the District Court with counsel, who presented a stipulation as to all the evidence to be introduced for the trial of the criminal charge. Under oath, Johnson waived his right to a jury trial, reaffirmed the stipulation, and stated that he knew that his reentry into the United States after deportation was illegal. Based on the stipulation and on the allocution, the District Court found Johnson guilty as charged. On October 16, 2003, following a review of the presentence report, consideration of the submissions of counsel, and further argument by counsel for Johnson relating to criminal history and family circumstances, the District Court applied the Sentencing Guidelines to impose a sentence of imprisonment of twenty-seven months, a term of supervised release of three years, and a special assessment of $100. This appeal followed.

## DISCUSSION

### I. *The Contentions of the Parties*

On appeal, Johnson contends that the statutory exhaustion requirement is unconstitutional; that, in any event, he was excused from the requirement by reason of the erroneous advice provided by the IJ; and that he satisfied the other two statuto-

---

**2.** The District Judge remarked that it was "useful to hear this tape because it demonstrates that the [IJ] was considerate to" John-

son and "did not require him [sic] or use a tone of voice that would intimidate."

ry requirements for collateral attack on his deportation order. With regard to those two requirements, he contends: (1) that he was deprived of the opportunity for judicial review, because of the incorrect advice imparted to him by the IJ; and (2) that the entry of the deportation order was fundamentally unfair, owing to serious procedural error (the erroneous conclusion of the IJ) and prejudice (the likelihood that Johnson would have been afforded § 212(c) relief). For the reasons that follow, we reject Johnson's claims that Congress exceeded its authority in imposing an exhaustion requirement, as well as his claim that his failure to exhaust was excused by the erroneous views of the IJ. We therefore have no reason to pass on Johnson's other contentions, and decline to do so.

## II. *Constitutionality of the Exhaustion Requirement*

█ Johnson's contention that Congress exceeded its authority in enacting Section 1326(d)(1) is premised on the argument that the statute somehow overrules the Supreme Court's decision in *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). Since this constitutional challenge never was raised in the District Court, Johnson must meet the requirements of the plain error doctrine to raise it here. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Feliciano,* 223 F.3d 102, 125 (2d Cir.2000). Johnson cannot demonstrate any error, let alone meet the requirements for a showing of plain error, in the District Court's failure to recognize any unconstitutionality in Section 1326(d)(1). Far from being inconsistent with *Mendoza–Lopez,* the statute is designed to carry out the Supreme Court's mandate for ensuring due process in any collateral attack on a deportation order.

As in the case at bar, *Mendoza–Lopez* involved prosecution for illegal entry into the United States following a deportation order. The defendants in that case moved in the district court for dismissal of the indictment, arguing that the IJ had not adequately informed them of their right to counsel at the deportation hearing. The district court rejected that argument, but found that the defendants apparently had failed to understand the IJ's explanation of their right to apply for suspension of deportation. *See Mendoza–Lopez,* 481 U.S. at 831 & n. 4, 107 S.Ct. 2148. Based on the IJ's failure in that regard, the district court concluded that the defendants had not made a knowing and intelligent waiver of the right to apply for suspension of deportation and, accordingly, dismissed the indictments. The Eighth Circuit Court of Appeals affirmed. *Id.* at 832, 107 S.Ct. 2148; *see also United States v. Mendoza–Lopez,* 781 F.2d 111, 113 (8th Cir. 1985). In its review, the Supreme Court defined the issue as "whether a federal court must *always* accept as conclusive the fact of the deportation order, even if the deportation proceeding was not conducted in conformity with due process." 481 U.S. at 834, 107 S.Ct. 2148.

Answering the question in the negative and affirming the Eighth Circuit, the Supreme Court provided the following rationale:

Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding. This principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative

order may be used to establish conclusively an element of a criminal offense. *Id.* at 837–38, 107 S.Ct. 2148 (citations omitted).

Section 1326(d)(1) is, on its face, wholly consistent with the dictates of *Mendoza–Lopez.* The exhaustion requirement does not, after all, foreclose or even limit judicial review; the statute merely requires an alien to pursue his due process objections through the administrative process before seeking judicial review—unless, of course, some defect in process prevented him from doing so in the first place. *Cf. Mendoza–Lopez,* 481 U.S. at 839, 107 S.Ct. 2148 (permitting collateral attacks only "where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review").

Moreover, the legislative history of the exhaustion requirement strongly supports the conclusion that Congress did not exceed its authority in enacting it. In creating the provision allowing collateral attack on deportation orders, Congress sought to "[s]treamline the process of deporting ... convicted criminal aliens." 140 Cong. Rec. 8883, 9890, 9891 (1994) (statement of Sen. Hutchinson) (presenting to the Senate an earlier bill, the Illegal Immigration Control Act of 1994, S. 2105, 103d Cong. (1994), containing language virtually identical to that embodied in § 1326(d)). The statutory language ultimately adopted toward this end, according to the legislative summary of the earlier bill, "[was] taken from *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987)," and "[was] intended to ensure that minimum due process was followed in the original deportation proceeding." 140 Cong. Rec. 8883, 9901 (1994) (summary of section 506(c) of the Illegal Immigration Control Act of 1994); *see* 8 U.S.C. § 1326(d)(1). Clearly, the act of legislation at issue is not one by which Congress

sought to *supersede* a constitutional rule established by the Supreme Court, *see, e.g., Dickerson v. United States,* 530 U.S. 428, 437–38, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that Congress did not have the authority to supersede the *Miranda* rule), but rather one by which Congress sought to *implement* a holding of the Court.

Further supporting our conclusion that the exhaustion requirement of Section 1326(d)(1) is entirely consistent with *Mendoza–Lopez* and the due process requirement for meaningful review enunciated in that opinion is the fact that we have regularly applied the statute in connection with challenges to underlying deportation orders made in conjunction with criminal prosecutions similar to the case at bar. *See, e.g., United States v. Perez,* 330 F.3d 97, 100–01 (2d Cir.2003); *United States v. Gonzalez–Roque,* 301 F.3d 39, 45 (2d Cir. 2002). We have specifically stated that "Congress effectively codified the holding in *Mendoza–Lopez* by amending 8 U.S.C. § 1326." *Fernandez–Antonia,* 278 F.3d at 157. Significantly, Johnson has cited no authority to support his contention that Congress exceeded its authority in promulgating the exhaustion requirement provided in Section 1326(d)(1). We have continuously applied the exhaustion requirement without any suggestion whatsoever of the constitutional deficiency proposed by Johnson, and we decline to find such a deficiency now.

### III. *The Failure to Exhaust*

■ Assuming, but not conceding, that Congress acted properly in establishing the exhaustion requirement, Johnson contends that his failure to exhaust his administrative remedies in accordance with § 1326(d)(1) was excused "by the misleading and incorrect advice he received from the [IJ]." This advice, according to John-

son, led him to waive his right to appeal to the BIA. This waiver is claimed to have been ineffective because it was not "considered and intelligent" under the circumstances. *United States v. Fares,* 978 F.2d 52, 56–57 (2d Cir.1992). *See generally Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (defining waiver as an "intentional relinquishment or abandonment of a known right or privilege."). To be clear, an alien's failure to meet the requirement of § 1326(d)(1) would be excusable where the alien waived the right to a BIA appeal and the waiver was premised on misleading information provided by the IJ regarding the alien's eligibility for discretionary relief. *Cf. United States v. Copeland,* 376 F.3d 61, 70 (2d Cir.2004). Here, however, a close examination of the colloquy involving Johnson, his counsel, and the IJ at the hearing held on June 8, 2000, set forth in full in the Background section of this opinion, reveals that Johnson's waiver was knowing and voluntary as well as considered and intelligent.

In the first place, the IJ clearly advised Johnson of his "right to appeal to a higher immigration court." Although the IJ advised Johnson that he "believe[d] that the law [was] against [Johnson] in this matter," the IJ specifically noted that the question of the retroactivity of the repeal of Section 212(c) was "an issue that ha[d] not been definitely decided by appellate courts." This issue must have been discussed by Johnson and his counsel, because counsel previously had filed a brief with the IJ arguing that Section 212(c) relief was available to Johnson on his claim for cancellation of removal. Indeed, it was not until *St. Cyr* was decided by the Supreme Court one year later that the issue was definitively resolved. *See generally* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347. Thus, the IJ's statements regarding Johnson's eligibility for § 212(c) relief

were far from misleading; indeed, the IJ quite accurately conceded that the law on this point was unresolved.

Second, before the IJ accepted Johnson's response, the IJ again advised Johnson of his right to appeal and further advised: "If you want to waive your appeal, it will be a final order and you will not be able to change your mind later on. Do you understand? What do you want to do? Your attorney suggested he might want to talk to you about this." The form of Johnson's response was significant: "No, I do not have the time. I wish to waive my right to appeal."

The reference to time obviously was to the time that Johnson would have had to remain incarcerated during the pendency of an appeal. This period of confinement apparently weighed heavily on his mind and in great part impelled his decision to waive his right to appeal. Moreover, he could not have been coerced in any way by the IJ's advice that Johnson would be detained pending an appeal, because he already must have known through counsel that such would be the case.

The reaction of Johnson's attorney to the waiver is notable: "That's what I thought he would say. Okay." In fact, earlier in the hearing, after the IJ had first asked whether Johnson would exercise his right to appeal, Johnson's counsel explicitly stated, "Mr. Johnson has expressed some concerns about taking appeal, the time that might take." It came as no surprise to counsel, then, after previous discussions with his client, that Johnson would give up his right to appeal an arguable point in return for immediate release from custody. The fact that Johnson did so did not render his waiver any less knowing, voluntary, considered, or intelligent. And, the fact that Johnson was informed of his right to appeal weighs

heavily against a finding that his waiver was not intelligent and considered. *See United States v. Paredes–Batista,* 140 F.3d 367, 376 (2d Cir.1998) (noting that where a defendant "[had] a right to a direct appeal, ... was informed of that right, and ... expressly declined to exercise it," he "faces a difficult task in attempting to claim that he was somehow deprived of his right to appeal from the IJ's deportation determination").

Third, and finally, Johnson throughout was represented by counsel, who took an active part in the colloquy. At the outset, in response to a question by the IJ as to Johnson's intention to appeal, counsel responded that he was not sure whether Johnson would exercise that right. According to counsel, Johnson had expressed some concern about the time that an appeal would take, time that Johnson would be constrained to remain in custody. Obviously, attorney and client had discussed, prior to the hearing, the advisability of an appeal. In any event, counsel went on to state that he wanted to discuss the right to appeal "more formally" with Johnson and his family before waiving the right on Johnson's behalf.

The Ninth Circuit cases Johnson cites for the proposition that he should be excused from the exhaustion requirement because he was given inaccurate advice are distinguishable because, in those cases, the appellants were not, as was Johnson, informed that the state of the law was imprecise at the time that they waived their rights, nor were they presented with specific suggestions to consult with available counsel. *See, e.g., United States v. Leon–Paz,* 340 F.3d 1003, 1005 (9th Cir.2003) (holding that where defendant "was entitled to be considered for § 212(c) relief" and "was given advice to the contrary and, thus, deprived of that possibility and of an appeal, his due process rights were violat-

ed"); *see also United States v. Pallares–Galan,* 359 F.3d 1088, 1093 (9th Cir.2004). It is significant that Johnson did not appear pro se in the deportation hearing as did the defendants in the Ninth Circuit cases. *Cf., e.g., United States v. Sosa,* 387 F.3d 131, 137–38 (2d Cir.2004) (finding dispositive, in excusing the exhaustion requirement and deeming the deportee to have been denied the opportunity for judicial review, the fact that the deportee, "[l]ike the aliens in *Mendoza–Lopez,*" was "uncounseled" in the brief period following the deportation hearing and, moreover, "had little practical chance of finding a lawyer" to appeal the deportation).

In a recent discussion of the exhaustion of administrative remedies requirement of Section 1326(d)(1), we were confronted with a situation where the IJ advised the alien as follows:

> There's no relief available to you anymore because the law changed in April. And the new law said that if you have a conviction for a controlled substances [sic] you're deportable and there's no relief. So I feel I have no alternative but to order you deported to Jamaica. You could accept this decision as a final decision or you can appeal my decision. Which would you prefer to do?

*Copeland,* 376 F.3d at 64. The defendant simply responded, "I will accept this decision." *Id.* In *Copeland,* we stated our "belie[f] that a failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)." *Id.* at 71. We there rejected the claim of futility and applied the exhaustion requirement, despite the fact that the BIA had consistently held the position that the 1996 amendments applied retroactively to aliens who had pled guilty to aggravated felonies prior to their enactment. The exhaustion requirement was

found to have been satisfied in that case by an appeal from a denial of a motion to reopen the deportation hearing. *Id.* at 67.

The differences between the *Copeland* case and the case at bar are manifest and critical: The defendant in *Copeland* appeared before the IJ pro se, while Johnson had an attorney; and the IJ in *Copeland* made no mention of the uncertainty of the law in regard to the availability of Section 212(c) relief, while the IJ in the case at bar noted the unsettled state of the law and suggested to Johnson that the issue of bringing an appeal was something that he˙ might well wish to discuss with counsel.

In view of the foregoing, we have no need to pass on Johnson's contention that he has demonstrated fulfillment of the second and third requirements of Section 1326(d)—deprivation of the opportunity for judicial review and fundamental unfairness in the entry of the deportation order. *See* 8 U.S.C. § 1326(d)(2) and (3).

### CONCLUSION

In sum, we conclude that Johnson effectively waived his right to appeal to the BIA and, therefore, failed to exhaust his administrative remedies. Accordingly, he has forfeited his right to mount a collateral attack on the order of deportation previously issued. On the record before us, we are constrained to affirm the judgment of conviction and sentence.